**Barrington D. HENRY, Plaintiff,**

v.

**GUEST SERVICES, INC., Defendant.**

**Civ. A. No. 94–2563.**

United States District Court, District of Columbia.

Oct. 12, 1995.

---

David M. Melnick, Rockville, MD, for plaintiff.

Stephen Bruce Forman, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, Leonard Paul Buscemi, Arlington, VA, for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on Defendant's motion for summary judgment. The Plaintiff brought this case under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101–§ 12213, alleg-ing in count I that the Defendant discriminated against him because of his disability (depression) by denying him emergency medical leave benefits, harassing him, and terminating him. In count II, Plaintiff alleges that the Defendant harassed and ultimately fired him in retaliation for filing complaints with the Fairfax County Human Rights Commission (FCHRC) and the Equal Employment Opportunity Commission (EEOC).

Defendant denies the charges and maintains that it fired Plaintiff for poor work performance. More specifically, Defendant contends that Plaintiff cannot establish a *prima facie* case of discrimination or retaliation. Further, even if Plaintiff can meet its initial burden, Defendant claims it has articulated legitimate, non-discriminatory reasons for its challenged conduct, which the Plaintiff has been unable to show are pretextual.

## BACKGROUND

Plaintiff, Henry, was employed by Defendant, Guest Services, Inc., from November 1985 until he was terminated on May 5, 1995. During this time, Plaintiff worked as a food services manager at facilities managed by Defendant at the National Gallery of Art and the Smithsonian Institution National Air and Space Museum.

Over the course of several years, Plaintiff struggled with depression, for which he first sought treatment in 1990. In July, 1991, Plaintiff missed approximately one month of work due to his depression. Plaintiff, who was experiencing marital troubles and receiving counselling from Defendant regarding his poor work performance, became increasingly depressed. In early May, 1992, he attempted to kill himself.

Following his suicide attempt, Plaintiff was absent from work from May 6, 1992, until November 17, 1992. At the time, Plaintiff requested 90 days of emergency medical leave. In September, 1992, while the request was pending and Defendant had not paid any benefits,[1] Plaintiff filed a complaint with the Fairfax County Human Rights Commission (FCHRC). The complaint alleges that De-

---

1. Defendant alleges it did not make immediate payment because it was awaiting medical confir-mation of Plaintiff's diagnoses, prognoses, and date of expected return to work.

fendant's failure to pay him emergency medical leave entitlements constituted disability discrimination. In late November, 1992, shortly after Plaintiff returned to work, Defendant paid the emergency medical leave entitlements.

Upon his return to work, the Plaintiff was assigned to the National Air & Space Museum. About five months later, in mid-April, 1993, Plaintiff filed a discrimination charge with the EEOC, alleging that he had been harassed due to his disability,[2] and reiterating his FCHRC charge of discriminatory delay in payment of emergency medical leave. Plaintiff also dismissed his FCHRC complaint.

During the course of his employment, Plaintiff's performance evaluations continuously and consistently declined. From a high of 89.9 in April, 1987, Plaintiff's reviews steadily slipped to a low of 64.49 in July, 1993. Despite his unsatisfactory performance, Defendant did not terminate Plaintiff, but instead encouraged him to improve his work performance. By September, 1993, Plaintiff had brought his performance back up to 71.3, slightly above the unsatisfactory level.

In February, 1994, Plaintiff was responsible for overseeing the cleaning of the restaurant at the National Gallery of Art, which had been closed 11 days for repair. As part of this responsibility, Plaintiff supervised a cleaning crew, which was at reduced strength since several employees had not shown up for work. Following the cleaning, the Administrator of the National Gallery of Art conducted a walk-through and was dismayed by the lack of cleanliness in the area which Plaintiff had supervised. The Administrator was particularly upset over the ovens, which still contained food left from before the restaurant was closed. The Administrator informed Defendant of her dissatisfaction. The following day, Defendant terminated Plaintiff.

**2.** The Plaintiff alleges that, upon his return to work after filing the FCHRC complaint, he was subjected to more intensive supervision than similarly situated managers (including being followed and clocked in the restroom), was denied

On about February 24, 1994, the Plaintiff filed another charge with the EEOC. The complaint alleged that Defendant retaliated against the Plaintiff for his earlier filing of his EEO complaint by harassing and eventually terminating him. On September 2, 1994, the EEOC issued right-to-sue notices. Shortly thereafter, Plaintiff commenced this lawsuit.

### SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Mere allegations or denials of the adverse party's pleadings are not enough to prevent issuance of summary judgment. The adverse party's response to the summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e).

The Supreme Court set forth the governing standards for issuance of summary judgment in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* the Supreme Court recognized the vital need for summary judgment motions to the fair and efficient functioning of the justice system:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1 . . . .

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims

vacation days and had his schedule changed arbitrarily. Plaintiff also alleged he was subject to jokes by management personnel concerning his mental condition and, on one occasion, found a cartoon in his mailbox joking about depression.

and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* at 327, 106 S.Ct. at 2555. (citation omitted).

██ The plaintiff, as the non-moving party, is "required to provide evidence that would permit a reasonable jury to find" in his favor. *Laningham v. U.S. Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987) (*per curiam*) (citing *Celotex, supra*). The moving party is entitled to summary judgment where "the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex* 477 U.S. at 323, 106 S.Ct. at 2553. Any factual assertions contained in affidavits and other evidence in support of the moving party's motion for summary judgment shall be accepted as true unless the facts are controverted by the non-moving party through affidavits or other documentary evidence. See Local Rule 108(h).

██ In resolving the summary judgment motion, all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202. The inferences, however, must be reasonable, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact. *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993).

## ANALYSIS AND DECISION

### I. BURDENS AND ORDER OF PROOF IN ADA CASES

██ Courts addressing the issue of burdens and orders of proof in ADA cases uniformly have looked for guidance to Title VII

case law. *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 157 (3rd Cir.1995) (citations omitted). Indeed, the ADA itself incorporates the enforcement provisions of Title VII and recognizes that Title VII procedures apply to ADA cases. 42 U.S.C. § 12117(a). The order and burden of proof in Title VII cases is as follows:

First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reason but were a pretext for discrimination.

*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), *citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, in analyzing plaintiff's claim of discrimination and retaliation in violation of the ADA, we must first look to whether the Plaintiff can establish a prima facie case.

### II. THE DISCRIMINATION CLAIM

Count I of the Plaintiff's complaint avers various ways in which Defendant engaged in disability discrimination.[3] However, with respect to these claims, Plaintiff opposed summary judgment only on the claim that the Defendant discriminated against him by delaying payment of emergency medical leave to the plaintiff.[4] Therefore, the only discrimination issue currently before the Court is whether the Defendant's delayed payment of the emergency medical leave benefits constitutes impermissible discrimination in violation of the ADA.[5]

---

3. The complaint alleges that the Defendant discriminated against Plaintiff by denying him emergency sick leave benefits, harassing him and terminating his employment.

4. At oral argument, Plaintiff conceded that his claim of harassment is essentially one of retalia-

tion rather than discrimination. Therefore, the Court deals with this claim under Count II.

5. The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement,

To make out a prima facie case of discriminatory denial of benefits, a plaintiff must prove: (1) that he has a disability, as defined by the ADA; (2) that he is otherwise qualified for the benefit in question; and (3) that the benefit was denied under circumstances which suggest the denial was due to discrimination solely on the basis of the disability. *Doe v. University of Maryland Medical System Corp.*, 50 F.3d 1261, 1265 (4th Cir.1995).

The Court assumes, for purposes of argument only, that Plaintiff's depression does render him disabled within the meaning of the ADA.[6] In addition, the Defendant appears to concede that the Plaintiff ultimately was qualified for the benefit in question since the Defendant did in fact pay the benefit.

The question which remains is whether Defendant's delay in paying the benefits was motivated by discriminatory intent based on Plaintiff's disability. Plaintiff asserts that the delay was caused by the Defendant's refusal to recognize that depression was a real illness which merited payment of the emergency medical leave.

Plaintiff has presented no credible evidence that Defendant's processing of Plaintiff's request for benefits in any way constituted disparate treatment from that provided to nonimpaired employees. The mere assertion of discriminatory intent is not, by itself, sufficient evidence to establish a prima facie case of disability discrimination. The evidence before the Court does not support an inference that Defendant's conduct was discriminatory.[7] Accordingly, the Court grants Defendant's motion for summary judgment on count I.

## III. THE RETALIATION CLAIM

In count II, Plaintiff asserts a retaliation claim.[8] To establish a prima facie case of retaliation, an employee must show the following:

(1) that he or she engaged in activity protected by the statute; (2) that the employer ... engaged in conduct having an adverse impact on the plaintiff; and (3) that the adverse action was causally related to the plaintiff's exercise of protected rights.

*Passer v. American Chemical Society*, 935 F.2d 322, 331 (D.C.Cir.1991) (citations omitted). The burden shifting scheme set forth in *McDonnell Douglas* applies in a Title VII retaliation claim. *McKenna v. Weinberger*, 729 F.2d 783 (D.C.Cir.1984).

The Defendant appears to concede that Plaintiff was engaged in a protected activity: filing of FCHRC and EEOC complaints alleging discrimination based on disability. With respect to the remaining two prongs of a prima facie case, Defendant's responds differently to the various factual allegations made by Plaintiff.

Plaintiff alleges that the Defendant impermissibly retaliated against him based on his filing complaints with FCHRC and the EEOC by (1) harassing him and, ultimately, (2) terminating his employment. The Court addresses each claim separately.

### A. Alleged Harassment of Plaintiff.

*Management Jokes.* Plaintiff makes various allegations of harassment. First, Plaintiff alleges that, following his return to work in November, 1992, he was subjected to jokes by management personnel concerning his de-

---

or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 § 12112(a).

6. Under the ADA, a disability is: "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an impairment." 42 § 12102(2).

7. Despite the fact that it was not required to do so, Defendant did assert a legitimate, nondiscriminatory reason for the delay. Defendant contends it did not immediately issue payment

because it was awaiting medical opinion documentation of Plaintiff's condition. Plaintiff has not shown this reason was pretextual. Thus, even if the Plaintiff had established a prima facie case, he still could not prevail.

8. Under the ADA, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

pression. The only evidence Plaintiff offers to support this claim is his statement that he found a "Peanuts" cartoon in his mailbox which made light of the condition of depression and that he overheard a coworker say "[T]hey shouldn't have done that. They shouldn't have put it in his box."

Even assuming, as we must, these facts to be true, they do not state a claim under the ADA. Plaintiff has presented no evidence to show that management was responsible for placing the cartoon in his mailbox. Nor has Plaintiff shown that management personnel knew that Plaintiff's coworkers were harassing him, yet failed to take remedial action.

 For comments to rise to the level of adverse employment action, the conduct must be so egregious as to "alter the conditions of employment." *See Patterson v. McLean Credit Union*, 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989).[9] As offensive as it must have been for the Plaintiff to discover a cartoon poking fun at his disability, Plaintiff has presented no evidence that such conduct was so severe or pervasive as to alter the conditions of his employment.

 *Intensive Supervisory Scrutiny and Arbitrary Scheduling Changes.* Plaintiff has also alleged that he underwent intensive supervisory scrutiny, was denied vacation day requests and was subjected to arbitrary changes in his daily schedule. Except as to denial of vacation day requests, Plaintiff has presented absolutely no evidence that he was treated any differently than other employ-

ees,[10] and thus has failed to establish a prima facie case of discriminatory retaliation.

 *Denial of Vacation Day Requests.* As to his claim that Defendant denied Plaintiff's request for vacation based on his disability, Plaintiff does meet his initial burden. As noted above, Defendant concedes the first prong of the Plaintiff's prima facie case, that Plaintiff is in a protected class. With respect to the second element—action constituting an adverse impact—the denial of requested leave which an employee has earned clearly has an adverse impact on that employee. Plaintiff has also met the third prong of his prima facie case. Defendant has conceded that it granted leave to another manager on some of the same dates that it denied leave to Plaintiff. Such disparate treatment suggests that the denial may have been motivated by discriminatory intent.

Despite having met his initial burden on the issue of denial of vacation days, Plaintiff still can not prevail. Under the burden shifting rules of *McDonnell Douglas*, once the Plaintiff has met his initial proof, the burden shifts to the employer, who can prevail only by articulating a legitimate reason for its action. Should the employer do so, the burden shifts back to the Plaintiff to show that the reason is a mere pretext.

 Defendant explained that it granted the other manager's request, while denying Plaintiff's request, because the manager had expressed a special need and had put in his request before Plaintiff's. Defendant further

9. Most of the case law on harassment deals with harassment based on gender rather than disability. However, the few courts addressing harassment claims under the ADA have applied the standards utilized in Title VII hostile work environment cases. *See Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092, 1995 U.S.Dist. LEXIS 10235 (S.D.Ga.1995); *see also Mannell v. American Tobacco Co.*, 871 F.Supp. 854 (E.D.Va.1994). This Court accepts that the Title VII standard—harassment so severe or pervasive as to alter the conditions of employment and create an abusive working environment—is applicable to harassment allegations made under the ADA. The rationale in each case is the same: to promote equality in the work place. Moreover, the Court finds persuasive the reasoning that any lesser standard of liability, "couched in terms of conduct that sporadically wounds or offends but

does not hinder" an employee's performance, would not serve the goals of equality. *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir.1995), *petition for cert. filed*, (U.S. Aug. 7, 1995; Sept. 6, 1995) (involving alleged harassment in Title VII discrimination suit based on gender).

10. Some of Plaintiff's allegations clearly cannot support a claim of discrimination. For example, Plaintiff alleges that Defendant changed the daily managers' meeting from 8:30 a.m. to 9:30 a.m. in order to prevent him from taking his medication, which he routinely took at 9:30 a.m. Plaintiff admitted, however, that no one told him he could not take his medicine at the meeting. Further, Plaintiff proffered no reason why he could not take his medicine just a few minutes earlier, before the meeting began.

explained that it could not grant both requests because the requests were made for holiday weekends, when the facility is particularly busy. Because Plaintiff has proffered no evidence to suggest that this reason was pretextual, his claim must fail as a matter of law.

In sum, the Court grants Defendant's motion for summary judgment with respect to retaliatory harassment. On all issues, Plaintiff has either failed to make a prima facie case, or been unable to rebut Defendant's proffered legitimate, nonretaliatory reasons.

### B. Termination.

■ In order to set forth a prima facie case of retaliatory termination under Title VII, a plaintiff must demonstrate the following four elements: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for continued employment and was satisfying the normal requirements of his job; (3) plaintiff was terminated; and (4) plaintiff was either replaced by a person not in the protected class, or such a person with comparable qualifications and work records was not terminated. *Klein v. Derwinski*, 869 F.Supp. 4, 7 (D.D.C.1994). *Accord, Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1512 (D.C.Cir.1995).

■ The first and third elements are not disputed. Plaintiff, by virtue of filing an EEO complaint, clearly was in a protected class, and both sides agree that he was terminated. Thus, to establish a prima facie case, Plaintiff also must show that he was qualified and performing satisfactorily, and that his replacement was not in the protected class. The Court does not even reach the issue of Plaintiff's replacement since Plaintiff cannot show that he was qualified for the job.

The undisputed facts show that Plaintiff's performance was poor and steadily declining. In fact, it had temporarily dipped below the satisfactory level, rebounding only slightly by the time of his termination. Over the six years preceding his termination, Plaintiff had received repeated counseling and clear exhortations of the need for improvement.[11]

Despite these counseling sessions, Plaintiff's performance continued to deteriorate. The record is replete with warnings to the Plaintiff about his inadequate job performance and poor attitude. Moreover, it is apparent from Plaintiff's comments to medical personnel that he knew his performance was wanting. In short, the record is exceedingly clear that Plaintiff was not performing satisfactorily and was not qualified for the job.

When the administrator of the National Art Gallery expressed dismay over the cleanliness of the ovens for which Plaintiff was admittedly responsible, her criticism combined with Plaintiff's long history of poor job performance to give Defendant just cause for termination. Thus, Plaintiff has not, and can not, establish a prima facie case of retaliatory termination.

The record is clear that Defendant had a legitimate, nondiscriminatory cause to discharge the Defendant. The facts simply do not support a claim of retaliation. Plaintiff's performance woes began well before he first was diagnosed with depression and substantially in advance of filing his first complaint. Additionally, more than two years elapsed between Plaintiff's filing of his EEOC complaint and his subsequent discharge. In short, Plaintiff's filing of discrimination complaints seems entirely unrelated to his negative performance evaluations and subsequent termination. Given Plaintiff's dismal job performance, his discharge would have been entirely unremarkable had he not earlier filed an EEO complaint. As the Plaintiff has failed to establish a prima facie case of retaliation, the Court grants Defendant's motion for summary judgment on the issue of retaliatory termination.

■ Retaliatory discharge is both deplorable and unlawful, and cannot be countenanced. However, an employee whose performance is truly inadequate cannot be allowed to use the vehicle of an EEO complaint

---

11. For example, as early as 1989, Plaintiff was told that he needed to show "immediate and lasting improvement" in certain, identified job areas, and that his job performance was "currently below standard and cannot continue."

to interfere with an employer's right to discharge a nonperforming employee. To allow the antidiscrimination laws to be used by poorly performing employees will eventually work to the detriment of those who have a legitimate need for the protection of the laws. What is more, if employers have to keep on their payrolls poorly performing employees, this nation's business community will be unable to compete in the global marketplace. The purpose of the antidiscrimination laws was not to create a bloated private bureaucracy and thereby undermine our finely tuned free enterprise system.

## CONCLUSION

For all of the foregoing reasons, the Court finds summary judgment should be issued for the Defendant. An appropriate order accompanies this memorandum opinion.

## ORDER

This matter comes before the Court on Defendant's motion for summary judgment. Defendant is entitled to judgment as a matter of law. Accordingly, the Court hereby **ORDERS** that Defendant's motion for summary judgment be **GRANTED.**